Our next case of the afternoon is in re of the Estate and Trust of Evelyn Weidner and for the appellant we have Mr. Wozniak who will only speak and reply, Mr. Parrish who will take the primary argument, for the appellee Mr. Riefsteck and Mr. Weaver will share time at their own will which means the guy that speaks first better be looking over his shoulder to see if the other fellow is waiting to get up. You may proceed. Thank you your honor. May it please the court and counsel. This case it seems like a very short straightforward case. I for one and I think most of the other lawyers were astonished after we heard the evidence to see the result but we only cited two cases in our brief. Dixon and the Cross case. The Cross case was an earlier case from another district which was adopted by this court in the Dixon case and I think probably the simplest and the most accurate statement of the logic behind all of these cases is found in the Cross case and it refers to the Knowles case or Knowles case out of Michigan and it said that what that says and it's a quote I believe or a phrase but it's a very good statement of what's going on here. It says well the terms of the trust do not evidence an intent to exclude adopted persons generally and that's true in our case. There's nothing about the language of the trust that answers the question one way or the other. We wouldn't be here otherwise. The court is convinced that it should not enforce such a statutory presumption and again there's a statutory presumption in Michigan which we have also. The 1955 law creates this presumption that adopted people can and should be adopted. Adopted people can inherit from ancestors of their adopted parents which is a whole shift in the way the thinking was. That was done in the 50s. But there's been an abuse of the adoption process and the end result would violate the settler's probable intent and normal expectations and I think the probable intent and normal expectations is what all these other cases are trying to get to. The Cross case used the word subterfuge which I'm not excited about. I think of a subterfuge as something different than what happened here. But in citing the minary case out of Kentucky the Cross case says this practice does great violence to the intent and purpose of our adoption laws and should not be committed. And going back to 1955 when the presumption was shifted there was no adoption of adults. So this question never could have come up until after 1960. And it didn't come up apparently, at least never got to the appellate court or Illinois court had to face it until the Cross case. And the Cross case basically said that we agree with the courts of other jurisdictions which have prohibited the practice. So the point is that the essential facts of what happened here and what happens in these other cases is somebody makes a will and then they die. And then a child of theirs adopts somebody who is an adult in each one of these cases. And the adoption is done after the will is written obviously, after the person has died and they can't change it, and also after the will has been filed. And in this case Betty had notice of her mother's will, maybe not had any notice until the will gets filed, she gets a copy in the course of the probate, and then she decides well I can do something about that. I can adopt my stepson who is now 22 or 23 years old and make him an heir. At the trial when Greg was asked the reason for this adoption, the first thing that came out of his mouth was for estate reasons. And then oh yeah, she loved me and we never had any fights or anything. Well, never had any fights is pretty faint praise for a relationship I would say. It certainly doesn't get you in a position where somebody would expect to leave you any property. I think that maybe that's kind of a weak description of the relationship that was testified to. We never had any fights. That's kind of a gloss, isn't it? That's one of them. They went on and they said he was at Betty's house for birthdays, they took a trip together. They make a big emphasis on the relationship between Betty and Greg. Betty the adopting mother, daughter of the grandmother, which Will was talking about. What we're looking at here is the intent of the grandmother and the grandfather actually. Well yeah, but if you look at, well, do we really care what the grandfather's intent is? Because he could have said, well, you know, that was okay. But I don't want that to be what happens to the rest of my estate. Well, he's also, we're not just talking about Evelyn's will, we're talking about a joint trust. Trust, yes, I understand. But expressing that intent after the fact. Well, of course, exactly. He didn't have an occasion to express an intent on that question. He didn't do it. And if you'd have asked him the day they wrote their wills and trust in 1988, I believe, you'd have asked him, he would have had a chance to think about it and the suggestion, the inference is, we don't know for sure, but the inference is, after he learned of this adoption, he knew what he wanted to do. Why should we think he changed his mind? The difference is, he got new information. He knew that this person, who he knew as his daughter's stepson, is now his grandson. And he said, I don't want him to inherit any of my property. I don't think that's a change at heart. I think that is an expression, I mean, it's just as likely, more likely, that it's an expression of his original intent than it is that I changed my mind. Well, it's just as likely as something I never even thought of before. Exactly. As opposed to having one view or the other. No, I agree. He probably hadn't thought of it before. He didn't think it was possible. He didn't know it. I don't imagine most people are writing their states, too. That's exactly right. And that's why... You mentioned the Cross case, and I was looking at that case, and obviously comparing it to the facts of this case, and there's a distinction that I noticed, and I wanted to get your thoughts on that. In the Cross case, we have a situation where the person was adopted, and then they were seeking to inherit from the person who was deceased, the grandmother. Yes. In our case, Evelyn did provide that the descendants of Betty would be able to inherit if she no longer lived. So it's not as if, I mean, I realize it came from Evelyn, but Betty was deceased, and this person was her descendant, and that was provided for in what Evelyn did. If I'm... I don't think that makes any difference. My daughter dies before I do, as in the case of the father, or after I do. Her descendants are my descendants, and it's a way of saying the same thing. I don't think we can attribute a big difference to whether we're saying Betty's descendants or my descendants, because the assumption is... And I think... Here's what I think. I think she's leaving open the possibility. She doesn't want to offend her daughter, who's now 45 years old. She's, well, probably past childbearing age. Right, because you're getting where I was going next. I mean, when Evelyn passed away, when she was preparing her will, she pretty much knew who her descendants were. Exactly. But she did leave open the question of who would be Betty's descendants. She did not say current or now living descendants. And so, while not likely, Betty could become pregnant and have another child, and that child wouldn't have been excluded. So why is this different? It just made me think of the case of the fertile octogenarian from law school. At some point, theoretically, yes, anybody can have a baby, and we have to anticipate that as a legal possibility. I just don't think it was a practical thought on these people's minds at the time. Well, what would the case... What if Betty adopted a younger child from the opposite side, from the other side of her family? Number one, there weren't any. Well, opposites... This guy was younger. This guy was... He was 10. Okay. So, here's the situation. If the older parents, they knew of Greg. He was around the family since before... Their daughter married Greg's father 10 years before the will was written. And they lived together 5 years before that. So they knew him really well. They knew who he was. Sure. When you make a will that says, I'm going to give something to my daughter's descendants, and she doesn't have any, but she has a stepson that's 23 years old, the intention would be, if I intended that person to take anything, I would have had to name him as a beneficiary, because I can't trust the fact that my daughter might adopt him and make him a descendant. If I want him to take something, I've got to name him. Because all Evelyn ever knew up until the day of her death, this young man was not a descendant of Betty, and there's no evidence that she ever thought he would be. I mean, I've been practicing law for 40 years, and I maybe do know more than I do, but I have never heard of an adult adoption in Macon County. Nobody's ever asked me to do it, and I have not heard of it. And it's not something that people do every day. The only reason you do it is to do something like this. So what if she loved him? She didn't adopt him when he was 18, when she had a chance to. Nobody told his natural mother for years after that, 10 or 15 years later. Well, they actually commented on that, or explained that. Is that to be not considered at all? They didn't tell the people either who were involved in this family who could have had an opportunity to do something earlier. What would they have done? Well, they could have talked to their father like that. Or maybe they did talk to their father. I don't know. You're right. They totally were sandbagged as far as the mother was sandbagged. She couldn't have done anything. There's no way that a dead woman can change her will and leave out somebody that she did not intend to be included. But she did intend that any descendants of Betty would be included. Well, I'm getting back to this Knowles case. We're talking about probable intent and normal expectations. It is very unlikely. I mean, it's possible that she intended that Betty would have a child. Most likely, way more probable than not, is that she did not expect Betty to. People do that. My mother did the very same thing, which is way outside the record. But people make provisions for the descendants of their children, knowing and not expecting they'll ever have any, because they want to don't shut the door on the possibility that my 45-year-old daughter might have a baby. Who knows? I don't want to say, I know she won't. She's my daughter. I love her. I don't want to offend her by taking some action to not let her descendants get anything. This family was very particular. Who got what? There was a son who didn't get anything. His children didn't get anything. There were other family members who were not provided for. And so I think it's a real stretched thing. She intended that Betty would just be a shot in the dark. Betty might have a baby or not. To think that is more likely than that she had a very clear plan of who was supposed to inherit her estate, and that that's what she intended. Most people, or many people, say, I'll give my estate to my descendants. And I don't necessarily name them, and I don't care who they are. All my children are fine, and all my grandchildren would be fine if they were going to take my estate. These people didn't do that. They were very particular. They didn't give it to all of their own descendants. They cut several people out. And I think given those circumstances, and all these cases, when they talk about We're finding the intention from the documents. Actually, they don't. It's not in Cross, it's not in Dixon, it's not in any of the other cases besides. They're all looking at the circumstances around the documents and the family situation at the time the document was prepared. Because there's no evidence in this document as to what the intention was with respect to adopted adults. As a matter of fact, that's why we put on evidence that this fellow only lived with Betty and Ron for 56 days, because he would not have qualified under the present version of the statute. The statute says that you can adopt an adult, and he can adopt from your ancestors, but not if he hasn't actually resided with the adopted parent during his minority. And the evidence is he didn't. You mentioned the evidence, and of course Judge Stedman found that it was clear from the evidence that in part this was motivated in order to make him eligible to inherit, but also done for the product of traditional parental desires is how Judge Stedman phrased it. So is it a credibility question? I mean, he finds that it was not done solely for the purpose of making Greg an heir. So is that a credibility determination that Judge Stedman made based on the evidence? Well, I think in any of these cases somebody could have, even in the Cross case where there was a fellow that lived to get little with the other fellow for 17 years, they could have articulated a reason other than the estate. I'm sure they did, and wouldn't have if they thought it made a difference. I think to the extent that the appellate court in Cross said solely, I think that was basically dictated. I don't think they had to use some of that word. I think Judge Stedman got hung up on that. He said he was thinking apparently any other reason besides this I have to approve. In Cross, let me just go back to that. In this case, if Betty had tried to adopt Ron, I think you'd have the same thing that happened in Cross. It would be solely for the purpose of making him an heir. So the stepson is a little different. She helped raise him, picked him up for visitations from the time he was six years old or so. So she had a maternal relationship with him as a stepmother. Now, to me the parallel situation with Cross is that she tried to adopt Ron. To make him her heir so that he would inherit from Evelyn, or from the Trust. In Cross' case, the two people who adopted each other probably couldn't have gotten married. They couldn't have. So that's another issue that's probably not thought too much about in many of these cases. As I said, this is probably the second adoption of an adult in Platt County, I would guess. The Ellerton case was the first, by reputation anyway. That was in 1960 when the law was passed. It was done at the instance of Mr. Ellerton. So he could adopt his protege, I think, would be a good description. He didn't have a parental relationship with his partner. That's the point I'm trying to make. It was a spousal-like relationship as opposed to a parental-type relationship. I think Judge Stebbin overstated the evidence when he said that their relationship was better than a typical step-parent relationship. I just don't think that's true. The evidence does not support that. Well, if you sit with the divorce court, you might think so. Because step-parents have a lot of problems in a lot of cases with the children from the prior marriage. But, anyway, go ahead, Justice Breyer. No, you're fine. Please continue. Go right ahead. I am nearing my conclusion here. I would just simply say that this Court in the Dixon case adopted the rationale of the Cross case. And, as I said in my brief, that was a rather cartoony stage situation because the women who were adopted were much older than 23. But what's not different is the fact that the adopted person was adopted very unexpectedly, at least unexpectedly, to the people who were making the initial documents back in 1988. And the whole point of that is that it frustrates the intentions of the people who created the document at the time they created it. The adoption took place after the grandmother died. There's no opportunity to make a change. The Court in Dixon said that the Cross case was similar and analogous and should be followed. I would suggest that this case is also strikingly similar to Cross and Dixon for the same reasons. And I do think it's relevant to consider the grandfather, that is, Lyle's later wills and codicils, and how he handles the issue with the adopted adult. First of all, he disinherits Greg by name and then by category in several subsequent documents. He never changes that. He changes who else is in and out of his will, being very specific. And I think that also shows the intent of both of these folks. Because I really think the grandfather's intent does relate back to his intent when he made the trust. And I think since it's a joint trust, I think we have to infer that their intent was the same. And I think the trust, the will that Evelyn made the very same day is also the same. So that's how I follow that. I don't think it's irrelevant. I think it is relevant. Well, you didn't really go off the record. You just described a personal experience with this kind of thing. I don't think my wife and I have the same intent. We have joint wills, but I don't know what her intent is beyond that. And I don't know how I could intelligently talk about it. When circumstances arise that perhaps wasn't thought of, I do understand that he's making clear his intent for the future. And that he's dissatisfied with what has occurred. But we can't read her intent from his simply because they did a joint trust. It's not conclusive. I think it's persuasive. I think it's relevant on the question. Well, I think it's relevant, I guess. I didn't mean to suggest it wasn't to be considered at all. Well, in each case when Greg was asked why the adoption took place, he said it was for estate reasons. And he didn't even have the sense to make us drag it out of him. That's the first thing out of his mouth. The will is for estate reasons. Well, a child judge might have been impressed by his credibility. That he admits, yeah, sure that's part of it. That's what parents do for their children, whatever their age. They plan for the future. Well, I think that shows that there is an intention to overcome, to defeat the probable and expected intent of the grandparents. Thank you, counsel. Thank you. We'll hear from co-counsel and rebuttal. May it please the court, counsel. I'm Kenneth Rebstack. I represent First Amendment Illinois Bank. I don't have much to add in this case. I'm in a unique position here where I'm an appellant in the case. And you can tell from the brief that we've agreed with the position of the appellant in this matter. The case is well briefed, your honors. And also it has what I think is an unusually clean record here with the way of evidence. Everybody stipulated to the evidence. And I just point to, again, how I'm going to be doing, if I speak very long, is reiterating the points of counsel a few minutes ago. And I don't want to take up the time of the court to do that. But we're looking at a situation here where we have a stranger to the adoption, and that is Evelyn Widener, who knew of the child years before an adoption took place. The timing, I think, is important to the adoption, that Ms. Widener passes away. The Wills go to probate. And then ten months later, there's an adoption of a 20-something-year-old child. And the reason for the adoption, as counsel stated, one of the reasons that Mr. Peter stated is I meant it was for the estate itself. Well, that adoption for parental needs and things like that could have taken place at least at age 18, four years prior to when it occurred, and it didn't. And it's just that the timing is not only suspicious here, but when coupled with what Mr. Peters himself said, I think that the heavy inference and the evidence shows in this case is that the purpose was to inherit from the estate. And even though it's not clearly stated in the trust itself, it wasn't in these other cases either. We're looking at the extrinsic evidence here, and I think that there's a very strong presumption that the sole reason for this adoption, given the timing, the age of the adoptee, and the words right out of Mr. Peter's mouth, that it was to defeat what looks like the intent of that one wife. So, counsel, is it your position that the Cross case does or does not stand for the proposition that you have to demonstrate that it was solely for the purpose of taking under the trust? Well, I think even if you take it as solely, that the evidence shows, Your Honor, that with the words of Greg himself, that it was for the estate, that the other needs would have to be, I suppose, parental needs would be the other rationale for it. Given the fact that this is a 24-year-old, 22-20, I don't want to mistake it, an adult child past the age of 18, I don't know that there was evidence that the parental needs such as needed support, needed help going to college, needed help with a place to stay, things that parents do for children who are adults, I just don't think there's any evidence sufficiently here, so I think you can say it was solely for that reason. And so you do believe that Cross stands for that proposition? I do believe that. The word solely is in there, and I'm tap dancing around this in pain. I don't think it can be solely when you couple it with the type of evidence that's available. I don't think what Cross stands for is, if you can show me one other reason, and the unrebutted evidence is individuals saying, no, it's for my parental needs too, that that defeats the Cross case. It's the best I can answer that, Your Honor. Thank you. Thank you. Counsel, Mr. Riefstad. I don't think we would be here if, in 1990, Betty Peters had adopted a five-year-old child. And she could have done that. But she didn't. She adopted Greg, who was an adult, but who had a 15-year relationship with her. He was her child in her mind, I believe. And I believe that's what Judge Stedman found the evidence to establish. In 1988, when Evelyn Peters made her trust and executed her will, she used descendants. And she provided for Betty's descendants at a time when Betty was married four times, not likely, although biologically not impossible to have children. Yet Evelyn, her mother, made provisions for her descendants. The law provided that, should she adopt, those descendants would be Evelyn's descendants. The law provided she could adopt a child. At that time, the law provided she could adopt an adult, which is exactly what she did. We talk about probable expectations. And truly, there's no way to know. But the law presumed a lawful adoption creates the relationship among lineals. And that's what happened here. It's not a surprise. I believe, and this is just my belief, that Evelyn gave those children that she favored and their children, or in the case of Betty and Jolene, who had no children apparently in 88, when she executed the will, the right to obtain descendants, whether by birth, adoption, or otherwise. And that's exactly what happened. The appellants rely on cross. And there was some discussion about the cross case. And I think there is a distinction in the language used. In the cross case, the ultimate grantor gave David the right, I think it's described as a special and exclusive right of appointment in his will, if he failed descendants, to name her, referring to Mary's descendants. That's a limitation that's different here. The limitation wasn't to Evelyn's descendants. It was to Betty's descendants. And at the time, the law allowed Betty to obtain descendants other than by natural birth. She could have adopted three orphans from the third world. And they would have been her descendants. And they would have taken. And I don't think we would be here today. And I don't think we should be here today based upon the evidence heard. Because I don't think there was a subterfuge. I'm not impressed by the cross case, although the cross case is made law in the Fourth District by the Wietkamp-Diller case. The cross case, that court, in fact, said, we're not going to look to the extrinsic evidence as to the relationship between the adopter and the adoptee. Because the law really only relates to the law of intestacy and through wills and trust. This was a special power of appointment. Will decline. And the court, in fact, said, we're going not to look at the extrinsic evidence of the relationship. But it is now the law because Wietkamp-Diller adopted it. And Wietkamp-Diller said that the adoption of an adult is a subterfuge or may be a subterfuge in derogation of the ultimate and probable likely intent of the document's creator. And you have to look at that circumstance and situation in the facts. And the facts in Diller-Wietkamp are truly outrageous. We've got a fellow who is the adopting party who adopts the children of a woman who he married at age 87. Adopted her, I think the youngest of the bunch was 55. At age 90 when he adopted them. And this is his wife who became his wife after she was his bookkeeper and after she charged his estate to go visit him when he was near death some years before. I mean, there was a business relationship. She had been his power of attorney. She paid her kids to care for him. The insurance company had paid her kids, the adopted ones, to care for him. The lawyer who was managing the estate essentially said, Mr. Hughes and Barbara Wietkamp cut a deal. She was going to take care of him and he would take care of her. And the reason why he was, or the purpose he was going to, or the method by which he was going to take care of her was adopt some of her children. That's totally different than the evidence presented to Judge Stedman and that that he found credible and that that he made a basis for his decision, which recognized that, yes, there was a financial component of this action, but ultimately it was the like parent-child relationship. It was the fact that Betty had no other children and Betty had been stepmother and Betty had been actively, continuously, conscientiously caring for Greg. And she did what she did based upon that as much or more than any other reason. And it certainly, the financial reasons were not the sole reason for the solemnization of the relationship that existed between the two. I believe the judge recognized that. I believe that's what the judge found. I believe that was the basis for his decision. And I believe it's not unreasonable. I don't think he abused his discretion. I believe his decision was proper based upon all of the evidence presented, most of which was stipulated, the rest of which was presented through live testimony. He found what he found. I believe he was accurate and correct. And I think it's a proper decision that this court should have made. Questions? I'm here. Thank you. Mr. Wozniak? Thank you, Mr. Carter, counsel. I think something that Mr. Weaver said here, no subterfuge. And I would respectfully disagree with that when you look at the timing of this adoption. He wants to extol the virtues of the relationship between Betty and Greg Peters. If the relationship was that strong, the adoption could have been done before he was 18, or I think more importantly to the facts of this case, the adoption could have been done when he turned 18. I think if you look at the timing of the adoption, he had already been an adult for four years, and it comes within less than a year of Evelyn dying. I think when you look at that timing objectively, that is your clear evidence of subterfuge that you would see in other cases. If their bond was that strong, there would have been no reason to wait until after Evelyn died. I don't know how it was explored, but wasn't there reference to trying to be thoughtful as to the feelings of his biological mother? That was said in the evidence, but I think that also belies the fact that Greg's mother testified that she and Betty were very close. And so if they were close, and I believe, I'm not going to get an exact quote here, I apologize, but that they were almost co-parenting Greg. If they were that close, there shouldn't have been that much friction caused by memorializing a relationship that she said was there. And once again, that still could have been done. I don't agree with, I mean, personal experience, I don't have any in that regard, but I certainly do about people who are very good friends and they like each other, and then one does something to the other that they think steps on their toes, which is a phrase that's used here, and it changes everything. The dynamic of step-parents and parents, I, all three of us probably, I don't know about you, but I spent a long time in family court and divorce court. I saw some astonishing things. That still could have been done after age 18, but before Evelyn died, and I think that is important in this particular case, the timing so soon after Evelyn's death. You couple that with the very clear statements that Greg made at the trial court level. Why did Betty come to you at the age of 22 to adopt you? I mean it was for the estate itself. I don't think it can get any more clear than that, that the overriding reason for this adoption was for financial purposes. And just as Mr. Weaver referenced the Dixon case, where that was for financial purposes, this was very clearly for financial purposes as well. He said it, he didn't mince any words about it, that it was for financial purposes. There was no other reason that this would memorialize a traditional parental relationship, given it was for the estate purposes itself, and he said it multiple times. What about opposing counsel's argument that the documents left open the ability of Betty to actually obtain descendants? And she simply did that. I think realistically that Evelyn wouldn't have anticipated an adult adoption. So I think when you look at those documents, and they're being done in 1988, I don't think she was trying to leave the door open for Betty to go find an adult to adopt to get her share of the estate that was going to pass on to the rest of the family. It's not something that she would have anticipated. I agree that you're looking at the additional fact that it's an adult, but what if she had become involved with the church and adopted one or two children from some mission? And she did it after the death, or near the time that Evelyn, in failing health perhaps. I think that's something that's more likely to have been anticipated by Evelyn, and also the other difference would have been if Betty would have adopted a minor child, she was taking on an additional legal responsibility for herself, as opposed to just putting an adult in a position for financial gain. If justices have no other questions. We do not. Thank you. And we'll take this matter under advisement and recess.